IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

AARON KUCHARIK,                         )
Garden City, Kansas,                    )
                        Plaintiff       )      Case No.       2:20-cv-2190
v.                                      )
                                        )      **COMPLAINT**
GARDEN CITY COMMUNITY                   )      **UNDER TITLE IX,**
COLLEGE,                                )      **42 U.S.C. §§ 1983 and 1985**
801 Campus Drive                        )      **DEMAND FOR JURY TRIAL**
Garden City, Kansas 67846               )
                                        )
and                                     )
                                        )
HERBERT J. SWENDER,                     )
former president of Garden City         )
Community College,                      )
in his former official capacity         )
                                        )
and                                     )
                                        )
MERILYN DOUGLASS,                       )
BLAKE WASINGER,                         )
JEFF CRIST,                             )
STEVE MARTINEZ, and                     )
TERI WORF, Trustees of Garden City      )
Community College, in their             )
official capacities.                    )
                        Defendants.     )

# COMPLAINT

Plaintiff Aaron Kucharik ("Kucharik"), by his counsel and for his causes of action against

Defendants states and alleges:

## Preliminary Statement

1.      This is a Title IX retaliation and civil rights action seeking declaratory relief and damages

against employees, volunteers, and officials of Garden City Community College in their official

capacities and the College as an institution for interference with and depriving Plaintiff Kucharik

of established constitutional and statutory rights.

1

2.      Plaintiff seeks full redress as provided by law against Defendants, state actors, under 28 USC §§ 2201 and 2202 for declaratory and other relief; under Title IX for damages and other relief for retaliation arising out of and/or based on Plaintiff's public support of civil rights, including those of himself, women students, faculty and patrons of the institution, whose Title IX and civil rights were also simultaneously under assault by the College.

3.      Plaintiff seeks against Defendants damages and other proper relief under 42 USC §§ 1983 and 1985 for the civil rights violations and civil rights conspiracy violations depriving Plaintiff of rights, privileges and immunities secured to him by the First and Fourteenth Amendments to the United States Constitution, and retaliation against him because he engaged in protected activities under Title IX.

4.      The asserted violations above and throughout this Complaint are also all associated with Plaintiff's identification by Defendants as a person who objected to:

A. the deliberate indifference for the Title IX rights of women exhibited by the College leadership and trustees,

B. a dismissive and permissive attitude by College leadership toward sexual harassment of women students, including in the cheer program,

C. the history of ineffective or nonexistent handling of sexual harassment complaints by College leadership and trustees,

D. deliberate indifference and retaliatory animus expressed by College leaders, volunteers and trustees against many College constituents like himself who publicly sought and supported better treatment of women at the College (including those who were singled out for various forms of rebuke by College leaders, volunteers and trustees), and

E.  the civil rights violations perpetrated by College leadership, volunteers and trustees against himself and others similarly situated as a class, on Equal Protection grounds, based sex.

5.      Plaintiff also asserts against Defendants deprivations and violations of his free speech, petition and associational rights, including by closing for a period of months the public comment periods of the College trustees' meetings that were a longstanding and well-recognized public forum, and otherwise wrongfully interfering in or denying his participatory rights in the college's public offerings, benefits, and programs based on his perceived class membership in support of women's rights.

## Jurisdiction and Venue

6.      This Court has jurisdiction over this action by virtue of its authority to hear federal questions pursuant to 28 U.S.C. §§ 1331 and 1343 as to Plaintiff's claims under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution and under Title IX, and other claims that may be raised that are so related as to form part of the same case or controversy pursuant to 28 U. S. C. § 1367(a).

7.      The Court has the authority to grant declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C.§ 2201 and 2202.

8.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all of the events giving rise to claims occurred in the District of Kansas.

## Parties

9.      Plaintiff Aaron Kucharik is a citizen of the United States and resident of Garden City, Finney County, Kansas.  He is an alumnus of Garden City Community College, the son of a retired faculty member, and "grew up" on and around the campus.  He was an officer, Executive

Secretary, and member of the Garden City Community College Endowment Association, until his resignation on June 18, 2018.  At relevant times hereto, Plaintiff was an active participant in a wide spectrum of programs and events offered to the public as a patron of GCCC, a season ticket holder for many athletic programs, a donor and volunteer for GCCC Endowment, one of two College-sanctioned fundraising organizations, and a well-known supporter of the College and its offerings.

10.     Defendant Garden City Community College ("GCCC") is a public community College located in Garden City, Finney County, Kansas, established and existing under the laws of Kansas.  It is overseen by a publicly elected board of six trustees who are statutorily charged with the responsibility to operate the College.  To the extent it is relevant to a particular claim, Plaintiff asserts on information and belief that the institutional Defendant is subject to liability under the § 1983 civil rights claims by virtue of the *Monell* Doctrine and under Title IX for discrimination and retaliation under that statute.

11.     The trustees are subject to the Kansas Open Meetings Act and board of trustees' meetings or distinct portions thereof as conducted during all relevant time periods are a public forum. Plaintiff seeks a declaration that their meetings and other campus sanctioned events at issue herein be declared as such for purposes of First and Fourteenth Amendment free speech, assembly, petition, and association rights.  This declaratory relief is not separately set forth as a count but asserted and contained herein.  There exists a case and controversy under federal constitutional law between the parties and subject to jurisdiction and venue herein as otherwise set forth in the facts and counts alleged.

12.     Defendant GCCC is a "person" within the meaning of 42 U.S.C. § 1983 and pursuant to state law the College is not entitled to sovereign immunity under any claims alleged.

13.     Defendant GCCC receives federal funds for its educational programs and thus falls within the purview of Title IX's governance and is subject to liability under the statute's enforcement features permitting a private right of action for damages.

14.     Defendant Herbert Swender at all relevant times herein was the president of Garden City Community College and an employee of GCCC.  Since August 2018, he is no longer employed by the College and his current residence is unknown to Plaintiff.  At all relevant times, Defendant Swender was acting under color of state law.  On information and belief, at all times relevant herein as president of the College Defendant Swender, whether by statutory or delegated means, exercised, seized and/or held final decision-making authority over all GCCC policies as well as responsibility for ensuring GCCC complies with all legal requirements.

15.     Defendants Blake Wasinger, Merilyn Douglass, Jeff Crist, Steve Martinez and Teri Worf are each believed to be residents of Finney County, Kansas and at all relevant time periods each one was a trustee of Garden City Community College.  At all relevant times, each trustee Defendant was acting under color of state law as an elected official of the College.  On information and belief, pursuant to state law trustees are empowered to set policy of the College as well as to delegate certain authorities to College administrators including Defendant Swender. Each trustee Defendant is sued in his/her official capacity, although subject to discovery each is placed on notice Plaintiff may seek amendment to assert individual liability claims.

## Facts

### Background Allegations

16.     Plaintiff possessed the rights under Title IX to have access to educational programs and facilities without experiencing sex discrimination, harassment or retaliation for his having publicly raised at board of trustees' meetings and elsewhere in the community the issue of

deliberate indifference of College leadership, including Defendants and other College employees, to sexual harassment of women on the campus.

17.     Plaintiff is a male.  Men are entitled to bring Title IX claims when they have been retaliated against because they complain about sex discrimination and Title IX does not require that Plaintiff be the victim of the discrimination about which he complains.

18.     Plaintiff possesses the right to not be retaliated against by the College, its agents, employees, volunteers, and its leadership for having become identified as a supporter of women's right to be free of sex discrimination and harassment and violation of this right is itself a form and act of discrimination under Title IX.

19.     Plaintiff possessed the right under Title IX to be free from retaliation.

20.     Plaintiff possessed the right to Free Speech, Association and Petition under the First and Fourteenth Amendments.

21.     Plaintiff possessed the right to equal protection under the Fourteenth Amendment. Plaintiff is entitled to law enforcement protection uncorrupted by personal animus, which is clearly established law.

22.     Plaintiff possessed rights under the First and Fourteenth Amendments for all actions alleged herein that were triggered by or taken against him by Defendants, which are associated with having spoken to the board of trustees on more than one occasion beginning on April 10, 2018, and continuing thereafter, including but not limited to the rights to be free of deterrence or deprivations to his rights, which were motivated by personal animus or malice, were done in retaliation for his exercise of First Amendment rights of speech and/or to deprive him of petition rights or for purposes of gender based Title IX retaliation, and/or for denial of rights on equal protection grounds, including by selective enforcement of violations against him as a class of one

as compared to others who have not been outspoken supporters of these rights on the campus and therefore are identified as the opposite class, and they have not been singled out for different treatment.

23.     Plaintiff possessed rights under 42 U.S.C. § 1985(3) based on a conspiratorial agreement reached by more than one person, motivated by a hateful animus or discriminatory attitude toward a specific class of people, men and women who supported enforcement of Title IX rights, which includes Plaintiff, intending to deprive him of the constitutional rights, above, and the conspiracy caused such deprivation and caused him injury.

**The Anonymous Envelopes**

24.     Plaintiff was drawn into this situation when he received two "dead drop" envelopes with no return addresses on March 19, 2018, in his employer's office drop box.  This occurred on Main Street in Downtown Garden City.   The anonymous envelopes were left surreptitiously, as envelopes sometimes do in mystery thrillers, at Price and Sons Funeral Home.

25.     Plaintiff is a funeral director.  He expected routine correspondence or maybe the envelopes contained a check along with an agreement.

26.     Those two envelopes would change his life in Garden City forever.  And he wasn't the only one, just an early one.  A summary of the events that evolved that summer of 2018 provides context.

27.     The community has come to refer to the maelstrom on the GCCC campus and what eventually became the Top Story of 2018 in the Garden City Telegram as simply "The Cheer Scandal".

28.     Before year's end the College would waive goodbye to the College President, the Athletic Director, the CFO, the HR Director and the cheer coach, to name just a few.

29.     The College would be visited by the KBI associated with a different set of "dead drops" regarding the one Trustee who stood his ground for the College and the Community.

30.     Other state and federal agencies have been involved in the various inquiries the Cheer Scandal triggered.  Rumors continue to fly about the Scandal in Garden City.

31.     A recall petition drive circulated petitions to recall five of the six College Trustees.

32.     During the Cheer Scandal, instead of the President being put on paid administrative leave while an investigation was done, five of the six Trustees voted to keep him at the helm, while he and his closest staff were seen working unusual hours, late at night, at the office.  Then, in the mornings there would be bags of paper shreds, so much paper having been processed during the repeated late-night shifts that the motor blew out on the heavy-duty shredder nearby the President's office.

33.     And then, President Swender unilaterally ordered out on paid administrative leave one Friday night in late July, the entire IT department, just days before faculty, then students, returned for classes, leaving it to outside vendors to chicken wire and duct tape together the campus computer system.  It was chaos for weeks on the campus.  The IT department would be welcomed back, with cheers all around, months later, having been cleared of any wrongdoing.

34.     In July students, faculty and staff were angry.  Nearly everyone in Garden City who heard about the IT department fiasco was livid with College leadership.

35.     Faculty Senate had presented the Trustees with a 26-page Report calling for immediate action to oust Swender on May 8, 2018 or resign themselves for poor oversight of the College.  A community petition was presented the same night.  Followed closely behind by staff petitioning for the President's removal.

36.     An investigator was retained in June.  Promises of no reprisal were sought by employees out of concerns about retaliation and given to them by the Trustees if faculty and staff would interview with the investigator.  The report was eventually presented months later and immediately debunked when the Trustee Chair was shamed into a public apology for having lied about his statements contained in the report.

37.     It came to light when the IT department was out on leave that they had never been advised of two different "litigation hold letters" directed to College leadership, which should have made their way to them.  Six weeks or so had passed.  The computer system's litigation holds procedures had not been followed or implemented.  Routine destruction of hard drives and machines had occurred during that time over the summer.

38.     On May 10, 2018, a "Fake" KORA request, under the Kansas Open Records Act, was received and then processed through IT on a fast track basis, pushed by the then head of HR, Emily Clouse, asking for the email records of more than 20 people, including Plaintiff, who had raised Title IX issues at the College as part of the Cheer Scandal.  The KORA request was a fishing expedition concerning individuals who might be termed critics of the President and related to the GCCC cheer and dance teams, among other topics, covering the time frame January 1, 2017 forward.  The evidence will link the recipient of the encrypted thumb drive to none other than President Swender, who read through them, according to the digital bread crumb trail.  This incident evidences his retaliatory intent to investigate Plaintiff's and others' communications, perhaps to ferret out enemies of the administration.

39.     And Plaintiff was just stepping out for an errand when he opened the envelopes and found two sets of the same documents, one set in each envelope.  There was a grainy copy of a picture of five young women's bare bottoms "mooning" out a hotel window.  Plaintiff would

find out later it was taken by the cheer coach, Brice Knapp, with the young cheer women posing from his hotel room while he was outside on a deck taking in the view.  There were also several letters, with redactions, which appeared to be from a student, from a mother, and from a different student.  This photograph was not the only cheer incident to be part of The Cheer Scandal, but it was likely the earliest, dating back to 2015.

40.     These are just a few of the incidents that are relevant to understand the depth and breadth of the Title IX problems and other issues President Swender and the five Trustees stoked in 2018 on the GCCC campus.

<u>**Plaintiff Targeted for Retaliation**</u>

**The February 23, 2018 Unauthorized Hearing**

41.     On February 23, 2018, Elizabeth Everett, a freshman member of the cheer squad, was in John Green's office, the athletic director ("AD"), for a meeting he called with little prior information given to Everett.

42.     She had been kept in the dark about the AD's real intent to conduct an impromptu, witness-confronting, adversarial hearing regarding sexual harassment claims Everett had, so far, only informally raised.  Green or his staff had referred to the event as a "meeting" when Everett was summoned to his office on a Friday, after normal business hours.

43.     Upon information and belief, Green knew or should have known that college policy required any allegations of sexual harassment be referred to the Title IX coordinator/investigator for handling, not investigated by the athletic department in the first instance.

44.     Everett contends the meeting, or rather pseudo-hearing, was a preemptive measure to tamp down Everett's informal reports of being sexually harassed in the Fall of 2017 through the

Spring of 2018 by the cheer coach, Brice Knapp, and being blackmailed in February 2018 by a cheer peer, Henry Arenas.

45.     While not involved personally in that February 23, 2018 impromptu "hearing", for Plaintiff, who found out about it after being drawn into the controversy by the "dead drop" letters, it was a pivotal event and an abuse of power in the college's handling of Everett's Title IX issues.

46.     Defendants commenced active engagement in behaviors that evidence deliberate indifference for the rights of female students and their supporters at GCCC.  This seminal event by Defendants or their agents acting at their behest is part of a series of penalizing acts directed at Everett, a community member, Toni Douglass and later Plaintiff, based on sex and based on Plaintiff's and Douglass' support for women.  These improper behaviors are at the core of Plaintiff's claims for Title IX retaliation.

47.     The reasonable and logical conclusion drawn is the AD's meeting was a pretext for summoning Everett to attend, by herself, an unsanctioned Title IX hearing and catch her off guard.

48.     What it became even more so was a deterrent or warning to women in athletics or women in general on campus do not question male authority or raise claims of sexual harassment because they will not be well-received.  Plaintiff would come to be served with similar deterrents or warnings as his involvement unfolded.

49.     Following the February 23, 2018 events, Plaintiff's concerns regarding bullying, intimidation, and mishandling of female athletes' complaints based on sex became intertwined and led to retaliation and civil rights violations toward the Plaintiff, toward Everett and toward

Toni Douglass--outspoken individuals who each suffered Title IX retaliation by the College and its agents, employees and/or volunteers.

**A Culture of Sexual Harassment in Cheer Program Ignored by Leadership**

50.     After the unusual February 23, 2018 hearing ended, Everett was concerned that AD Green had more reasons than before to sweep her complaints and the cheer program's sexual harassment issues under the rug.

51.     Everett had not shared these events before with her mother, which is why she contacted Toni Douglass, known among student athletes as a trustworthy and caring adult who had been a host mom for years to many students.  Douglass pointed Everett to her mother for a frank discussion and family support.

52.     The administration (Defendants) chose to keep covering up for their own ills of ignoring sexual harassment in the cheer program by blaming the victim (Everett) and anyone who supported her (Plaintiff Kucharik and Toni Douglass, among others).  But the trustees of the College, by Kansas law, are charged with overseeing the administration of GCCC and Plaintiff Kucharik as well as Toni Douglass, Elizabeth Everett, and her mother, Eleanor Everett, all hoped and believed that once the trustees knew about the administration's maladministration, they would take action to rectify the problems.

53.     Plaintiff and these three women, along with others to come, were mistaken in that belief because upon information and belief, at least one trustee had a specific, liability-related reason to hide the problems to protect himself.  Discovery is necessary to confirm this assertion but on information and belief the claims are more than plausible, as explained below.

54.     Plaintiff will recount, upon information and belief, that through the Everetts he became aware of at least one trustee (Defendant Wasinger) who knew Everett well and for reasons of his

own making chose to join in the improper behaviors and engage in the cover up, as well, backing the administration Defendants to mask his liability-triggering involvement.

55.     When Everett told her mother, Eleanor Everett, what was going on and what happened with AD Green and coach Knapp, Eleanor recalled an odd comment made by Dr. Blake Wasinger, a/k/a/ Defendant Trustee Wasinger, in the summer of 2017.  During her daughter's physical exam for cheer he said to Eleanor something to the effect of be careful about the cheer coach and your daughter's participation in cheer.

56.     Eleanor had taken that comment to heart, because before Elizabeth got too involved in cheer in the summer of 2017, Eleanor took the time to speak to coach Knapp about not exposing her daughter to unsavory experiences/behaviors through the cheer program, especially because of her age.  Knapp assured her he would watch out for her daughter.  Plaintiff Everett was 17 at the time and an early high school graduate.

57.     Sadly, Trustee Wasinger knew too much but did too little where Elizabeth Everett is concerned and his personal accountability regarding Plaintiff Kucharik and retaliation against him bears further investigation.  Plaintiff places him on notice this Complaint may be amended to include an individual claim if discovery reveals his individual responsibility.

58.     He obviously knew about coach Knapp's prior sexual harassment issues or he would not have made the oblique, but neither particularly clear, nor completely honest, comment.  It appears he must have intended to put Eleanor Everett on aware of something untoward about the coach's proclivities.

59.      It stands to reason that after the AD Green incident on February 23, 2018, Dr. Wasinger would surely want to know about what happened to Elizabeth, because he was so prescient the previous summer.  He would want to receive confirmation that what he foretold was a reality and

happening on the campus, in order to do the right thing and fix the root causes of the problem, once he knew about it from Eleanor.  He would stand up, courageously, and protect his patient, Elizabeth, because he's a member of the healing arts for goodness sake and has taken an oath to do no harm.  And he would not be alone in this quest for Title IX justice.  And he would not use what he knew about Everett to double down and retaliate against Plaintiff Kucharik or Toni Douglass, who publicly spoke to the Trustees on April 10, 2018 and supported Everett by speaking up, because that kind of retaliation itself would be bad behavior by a doctor.

60.    Plaintiff Kucharik believed that there was little doubt trustee Wasinger would be immediately joined in this effort by the two nurturing women on the board of trustees, who also are members of the health care profession, two nurses, one of whom uses the moniker of a "doctor", because they also care about doing no harm.  They were all well-respected medical professionals for goodness sake.  They care about the College and students and the Garden City educational community and its reputation in Southwest Kansas for goodness sake.  They would listen and take action.  And they would not retaliate against Plaintiff Kucharik.

61.    Plaintiff Kucharik believed that Dr. Wasinger would also tell all the other trustees about his having cautioned Eleanor Everett about coach Knapp, so they would all know that they, as the six elected fiduciaries overseeing the president, who oversaw all the other College employees, had to respond quickly and appropriately--because Dr. Wasinger knew coach Knapp's history was likely to repeat itself and sexual harassment claims by women in cheer were potential problems waiting to happen, and it did happen, to Elizabeth Everett, and so the trustees all needed to work together to find the root cause of this Title IX problem, to use their state granted authority to investigate why this continued to happen, unabated, and make permanent, systemic changes at the College, so other women students would not suffer from further harm or

else they risked College institutional liability because one of the trustees knew there was a problem and if he did nothing to convince the other trustees to do something then the potential risks were and are enormous.

62.    And Dr. Wasinger would surely not retaliate against Plaintiff Kucharik for standing up for Everett and other cheer women who had been harassed, especially when you add the fact that Plaintiff Kucharik delivered the picture from the "dead drop" along with the letters to a number of College employees, who Dr. Wasinger oversees.

63.    Plaintiff took the information first to Melanie Hands, Title IX coordinator, who took it to Ryan Ruda, who returned it, saying it was a personnel issue and take it to HR.

64.    Plaintiff took it to HR director Emily Clouse, who accepted the information from him and said she would look into it and address it as soon as possible and then walked out of her office. Nothing more was said or followed up with Plaintiff Kucharik to say there was some conclusion.

65.    But given all the hands that touched and the eyes that saw all or portions of the "dead drop" information Plaintiff delivered to the College on March 21, 2018 and combined with what Dr. Wasinger knew about coach Knapp, it stands to reason from Plaintiff Kucharik's perspective that Dr. Wasinger would use his powers of persuasion to be sure the trustees would allocate funds necessary, at the time, to get professional advice and nip this in the bud.  He would not retaliate against Plaintiff Kucharik with this much evidence at his disposal and within his realm of knowledge.

66.    And it stands to reason the three trustees mentioned above would be joined immediately by the law enforcement officer on the board of trustees, Board Chair and Sheriff's Deputy Steve Martinez, who has taken an oath to uphold the law for goodness sake.  And Title IX is a law. And he would want to fix the underlying problems, too.  And he would not tolerate or overlook

retaliation of Plaintiff Kucharik and Toni Douglass and others, because he's a member of law enforcement.

67.     And they would be joined immediately as well by the minister and hospital chaplain, Trustee and Minister Jeff Crist, who has accepted a calling by God to tend to the needs of all in harm's way for goodness sake.  Elizabeth Everett was put in harm's way.  And he would see that what happened to her was wrong.  And he would not retaliate against Plaintiff Kucharik or Toni Douglass or others who stood up for women's rights on the campus.

68.     And last and certainly not least, retired banking executive and a caring man, Trustee Leonard Hitz, NOT a defendant herein, was already asking questions about how to fix things because he lives across the street from the Everetts and he was on board with getting to the root problem from the moment he heard about what was going on.

69.     So logically at the time the Everetts and Plaintiff Kucharik and Toni Douglass and others were wondering what to do, who to turn to, and relying on the trustees, they each reached a logical conclusion—there's no need to worry, the doctor, two nurses, a sheriff's deputy, a minister and the neighbor who's a retired banking executive—these 6 trustees would work together once Dr. Wasinger shared their plight with them because they were from caring, impeccable and responsible backgrounds who as fiduciaries would no doubt do the right thing for goodness sake.  And they would not retaliate against Plaintiff Kucharik and the Everetts and Toni Douglass and others.

70.     No doubt Dr. Wasinger and the two nurse trustees would lead the board of trustees to take action and the whole board of trustees would tap into the multimillion dollar budget and retain whatever unconflicted and disinterested Kansas counsel that they needed to retain, separate from the administration, in order to advise them how best to address the multiple Title

IX claims wrought by the cheer coach and/or by the president's faulty supervision, given that Defendant Swender was their "only employee", who supervises all other employees on campus.

71.     Plaintiff Kucharik hoped and wanted to believe that Dr. Wasinger would listen and help because he was a doctor.  This seemed to be a logical conclusion.  However, all these preceding assumptions, except about trustee Hitz, were wrong because Dr. Wasinger chose to side with Swender and four other Trustees and thereby to foster the retaliatory animus that was unleashed against Plaintiff Kucharik.  He would say and do nothing to lead the College to engage in conduct reasonably calculated to end the harassment and not retaliate against Plaintiff Kucharik. Wasinger perpetuated discriminatory acts and caused Plaintiff to suffer adverse actions, which are attributable through the four Trustees' behaviors as wrongs of the educational institution itself.

72.     Dr. Wasinger sought to distance himself, rather than effect change, as if the taint of his prior knowledge could be erased from the Everetts' memory banks, who will attest to these facts. It can't be erased.

73.     Furthermore, his lack of real concern is an omission by a trustee.  When called upon to assist in correcting a Title IX problem, the lack of response by an elected trustee is an overt act. Denial of responsibility is ineffective to cure or respond to a particular harm the state actor contributed to causing, when an official has prior knowledge of the danger and gives an ineffective warning.

74.     Plaintiff asserts the College acted with deliberate indifference based on Dr. Wasinger's prior knowledge and warning, inadequate that it was, to the claimant.

75.     Plaintiff asserts the College acted with deliberate indifference based on the receipt of the "dead drop" information Plaintiff Kucharik delivered to the College's responsible employees.

76.     Plaintiff asserts Dr. Wasinger's non-responsiveness evidences more than deliberate indifference of an elected official charged with College oversight.  Evidence will show, for example by review of his voting record and other statements/actions relevant to the Plaintiff Kucharik's claims, that in the nearly two years since the problems of Title IX harassment and retaliation were raised with him, Dr. Wasinger has taken more overt actions to ignore, downplay, intimidate, retaliate and otherwise deter Plaintiff and others from positively dealing with Title IX problems or he has denied there is or was ever a problem.

77.     Dr. Wasinger and four other trustees' approval (excepting trustee Hitz) in January 2019 of the report of investigator Greg Goheen, the supposedly independent investigator hired to report on a May 8, 2018 Faculty Senate Report to the Board, evidences the college's ongoing institutional deliberate indifference toward rectifying sexual harassment issues raised by Plaintiff.  Plaintiff's information about the "dead drop" and his contacts delivering that information to the College is nowhere to be seen in his report.

78.     This means that Dr. Wasinger, in particular, but also presumably the other four Trustees he frequently communicated with at the time, not Leonard Hitz, knew the investigator's report was fatally flawed, inaccurate and a cover up for Dr. Wasinger's and others' retaliation against Plaintiff Kucharik and others similarly situated under an Equal Protection Fourteenth Amendment claim, as well as under Title IX.

79.     Dr. Wasinger and the four Trustees who VOTED to accept the tainted report of the investigator, by their votes made an official, on the record, decision (in January 2019 at their monthly meeting) NOT to remedy the issues raised by Plaintiff Kucharik, and the Everetts and Toni Douglass and others.  This decision and this vote are the epitomes of gross negligence at a minimum and intentional misconduct at its maximum.  It is more than just "deliberate

indifference", the Title IX standard for liability.  The adoption of this sham report is also evidence of motive to retaliate and evidence of animus toward Title IX matters.

80.    These behaviors increased the harm already done to cheer women and against Title IX permanent policy reformation, as explained herein.

81.    This same board vote also separately exemplifies another instance of ongoing Title IX based retaliatory action against Plaintiff in January 2019 by the publication and release of Goheen's findings the Board knew or should have known were:

    A.  misstatements of facts, as reported (per se)

    B.  misstatements of facts by omission (per quod) of material necessary to make the Report accurate and not misleading or defamatory

    C.  fraudulent findings/conclusions that became adopted Board actions/policies caused by intentional omission of Dr. Wasinger's prior knowledge of Knapp's sexual harassment claims history coupled with Dr. Wasinger's state created danger, failure to adequately warn, breach of fiduciary duties, failure to supervise, suppression of material evidence Trustees needed to know to properly act on Title IX concerns or adoption of known, inadequate remedies to Title IX gender based policies through Dr. Wasinger's indifference or improper behaviors

82.    Upon information and belief, the Trustees' acceptance and adoption of that part of the Goheen Report referring to Elizabeth Everett's claims as their own, presumably accurate factual findings of the board sans any reference to Dr. Wasinger's prior knowledge of Knapp's proclivities and his warning to Eleanor Everett evidences the inherent problem of deliberate indifference.

83.     Add to that the glaring omission in the report of the "dead drop" information, which should have been included as part of the narrative having to do with the handling of the bare bottoms photo at page 25 of the Goheen Report.  It becomes an obvious and natural conclusion to draw that Plaintiff Kucharik is and was a distinct target for retaliation in the leadership's hopes of eradicating negative publicity and potential liability for the Defendants' intentionally discriminatory conduct.

84.     Additionally, objective evidence of trustee's deliberate indifference to Title IX claims is not limited solely to the circumstance of Dr. Wasinger's interactions with the Everetts and Plaintiff Kucharik's "dead drop" information.  The Defendant trustees in the Spring of 2018 made at least one board-wide objective, censorious gaffe with this event captured on video and posted online.

**Video April 10, 2018 Meeting-Trustees' Indifference to Student and Title IX Supporters**

85.     On April 10, 2018, based on a majority board decision, at least five members of the board, all named Defendants, decided the board's policy would be to refuse the request of a female cheer student to reopen the public comments portion of their meeting to hear from her.

86.     Upon information and belief, the student had been in her night class when the board's public comment sign-up sheet was made available, so she was not able to follow the board's protocol.  She approached the board and proceeded to ask for an exception to their routine protocol because she had information germane to the topic of Title IX complaints of sexual harassment by coach Knapp.

87.     The video is worth a thousand words, which is offered for the purpose of objective assessment of the board's tolerance or intolerance, deliberate indifference, their attitude toward controversy raised by female students with Title IX complaints at an official meeting, as well as

their overall attitude toward female students who respectfully asked for their time and attention on an important trustee oversight issue.

88.     Some trustees and/or administration nay sayers have questioned whether letters or claims presented to the board that night were faked or expressed doubt that real students were harmed or felt violated by coach Knapp, which made this student's personal statement all the more significant in this context.  See, https://www.youtube.com/watch?v=u_3ZORme3Ys (last accessed 2-18-2020) at 10:55 into the video.

89.     Plaintiff Kucharik spoke at the beginning of that open comment section of the meeting and the video contains his statements to the board.  He told them about the "dead drop" letters and his delivery of information to the College.  He also told them about his meeting on or about March 23 with a detective at the Garden City Police Department.

90.     Toni Douglass and Eleanor Everett also speak at the beginning of the video.  This video of public comments captures the trustees' reactions in the moment and evinces the tone and non-receptiveness of Trustees for the Title IX supporters' advocacy.  It was not welcomed.

91.     Trustees and Defendant Swender are presumed to know the College's history of having been cited in 2007 by federal authorities for Title IX inadequacies involving a female athlete under similar circumstances, which occurred under a prior president's tenure.  Two of the five named Trustees, Douglass and Worf, were College trustees at the time of the Agreement; however, the Agreement's existence was not well known in 2018, including, upon information and belief, among some faculty and staff employed in or around 2007.

92.     Toni Douglass reported to Trustees that among other things the facts were Everett was being discriminated against because of her sex and added that Everett was not the only woman athlete in the cheer program to have attended Garden City Community College and to have been

subjected to unwelcome, improper sex discrimination.  She presented letters from seven women or their parents addressing sex discrimination involving the cheer coach.  She asked the Trustees to rectify the sex discrimination problems at GCCC.  They have never adequately acknowledged and done so.

93.     Following these statements by Plaintiff Kucharik, Toni Douglass and Eleanor Everett, all three individuals were retaliated against for the outspoken, lawful conduct in daring to speak truth to power.  Oddly, the minutes of that meeting fail to include the presence of Plaintiff Kucharik, leaving a glaring hole in the proceedings that took place that night, despite the evidence on video of him speaking, which upon information and belief was widely circulated both on campus and in the community.  This appears to be a deliberate attempt to rewrite history because the most damaging materially adverse behaviors are detailed below.

**Coach Knapp Leaves with Questions in his Wake**

94.     Between February 23 and April 10, 2018, there were a series of interactions, meetings, and other communications involving Toni Douglass and Everett, AD Green, coach Knapp, Defendant Swender and other administrators regarding the mishandling of complaints involving coach Knapp, which bear mention for purposes of context, are material and relevant, but whose details are omitted for brevity of a Complaint.

95.     Plaintiff avers that as a result of the Everett Title IX complaint and perhaps the information he brought to HR, coach Knapp and the College eventually severed the employment relationship, although upon information and belief questions linger regarding whether Knapp was surreptitiously kept in the fold and on the payroll but hidden from public view.  Upon information and belief, Knapp retained state authority and influence over College sanctioned

actions after his purported final day of employment on March 29, 2018 by virtue of an extended payout or other agreement.

96.    Upon information and belief, Knapp was seen on campus in the summer of 2018 in the vicinity of the athletic department when the College advised Plaintiff and the public Knapp was history not to be dwelled upon, he was to have no contact with cheer members or to be involved in College activities.

97.    Upon information and belief, Knapp was known to have actual video editing skills on the athletic department's equipment, which equipment has been suspected to be a means or mechanism upon which someone may have created an anonymous video alleging Trustee Hitz sexually harassed female students on stage at the May 2018 graduation when he congratulated and hugged some students he knew well.

98.    Plaintiff avers that retaliation against any supporters of Elizabeth Everett's claims, including but not limited to Plaintiff Kucharik and Toni Douglass, is or could be probative of the theory that a § 1985 conspiracy was engaged in by certain Defendants, rippling outward into the community as a warning to the public to deter criticisms of Defendants.

99.    The deliberate indifference of top administrators became apparent in the meetings referenced above and in factual situations addressed herein in other contexts.  See, No Trespass Retaliation of Toni Douglass, below, as one example.

**NJCAA Sanction Ancillary Retaliation**

100.    Even before the Everett hearing in February, Toni Douglass had been concerned about how female students in other athletic programs were being mistreated as pawns for the AD's exploitation and/or manipulated financially through scholarship irregularities, specifically a woman volleyball player from Hawaii, who Douglass had gotten to know as her host mom.

101.    That student athlete's claims involve Toni Douglass but not Plaintiff or Elizabeth Everett per se.

102.    Upon information and belief, either one or both Defendant Swender and AD Green, in the summer of 2017, exhibited enough concern or personal animus toward Toni Douglass that the student was commanded by College administrators NOT to ever mention to Douglass the nature, location and circumstances of the student's residence arrangements at AD Green's home in the June/July 2017 timeframe or else her standing as an athletic scholarship holder would essentially evaporate and she would become persona non grata at GCCC.

103.    The student athlete understood the command to be a threat and a form of intimidation clearly intended to drive an associational wedge between Douglass and the student, contrary to both of their First Amendment rights based on questionable motives to cover up NJCAA sanctionable conduct both Defendant Swender and AD Green knew about, sanctioned or jointly or severally conjured up as a way to have their cake and eat it too at the expense of this student's and Toni Douglass's association and personal relationship.

104.    This situation is probative in this case for Plaintiff Kucharik's claims because it evidences the extreme and outrageous lengths and deeply rooted conspiratorial nature of Defendant Swender's actions or AD Green's actions as those individuals will be shown to have gone to.

**Defendant Swender and his Supporters Develop and Express Animus toward Plaintiff**

105.    Defendants conceived and carried out extreme strategies because of their expressed and unabashedly held animus they developed for Plaintiff Kucharik, Toni Douglass and Elizabeth Everett.

106.    As questions regarding Title IX violations grew, and the newspaper was publicizing stories about the Cheer Scandal so did the express animus of certain Defendants.

107.    It was Defendant Swender's standard operating procedure that critics of Defendant Swender were not to be permitted or tolerated on campus, as evidenced by the Faculty Senate Report of May 8, 2018.

108.    Plaintiff Kucharik, Toni Douglass and Elizabeth Everett were dangerous to Swender's career.

109.    Toni Douglass was asking too many questions, as well as Plaintiff Kucharik, and finding too many negative answers.

110.    Elizabeth Everett's claims were both credible and admitted to by the male cheer student.

111.    Because Defendant Swender is the "only employee of the board of trustees" he was falling under scrutiny.

112.    Women in general on GCCC's campus were less well-respected than men and devalued by Swender.

**The April 10, 2018 Trustees' Meeting and its Aftermath**

113.    By April 2018, Douglass had already come under suspicion of the College administration because she had been asking questions since 2017 about issues she saw affecting other women athletes and had begun attempts to quietly and privately address systemic issues she had become aware of going on at GCCC.

114.    Douglass's quiet efforts on behalf of female athletes were responded to by being merely strung along by trustee Merilyn Douglass, then clearly rebuffed with stony silence.

115.     Plaintiff Kucharik entered the picture in mid-March 2018 and by April 10 became a

target of retaliation by Swender and/or at his behest, encouragement or subsequent ratification

the target of one and perhaps more volunteers he was closely associated with, Kimberly Reule.

116.     Plaintiff Kucharik recounted the "dead drop" incident to the board on April 10, 2018 and

called on the Trustees to do something about the three years of failed responsiveness to the cheer

coach's known proclivities to sexually harass women cheer students.

117.     Eleanor Everett also spoke, and her comments can be viewed on the video, referenced

above, as well.  She was asked to finish Douglass's comments to the board because the board

was bent on limiting to five minutes anyone who came before them (which appeared to be a

newly enacted time limitation instigated after January 2018, coincidentally after the leadership

knew there was a growing community undercurrent and people might want to speak publicly at

their meetings.)

118.     Eleanor Everett laid her daughter's plight at their feet, because Elizabeth should never

have been exposed to the wrongful behaviors of Brice Knapp, if the College leadership had been

doing proper oversight in the three years prior.  Dr. Wasinger knew more than he led her to

believe and he should have done more to sound the alarm, BEFORE Elizabeth was preyed on by

Knapp and set up for blackmail by a male peer.

119.     None of these three individuals should have had to go public but for the facts that the

board of Trustees appeared to be willfully ignorant, deliberately indifferent and then blatantly

retaliatory against critics of Swender.  Knapp's employment ended in late March but the

retaliation for going public about the Cheer Scandal so altered Plaintiff's life that he found it

necessary to resign from his board membership on the College Endowment Association, he lost

friends over the Cheer Scandal as people in Garden City took sides during the course of events as they played out, and he believes he lost business because of it.

120.    Plaintiff bases that assertion on one incident he can attest to involving Trustee Crist.

121.    On November 27, 2018, after 7:30 p.m., Trustee Crist, as hospital chaplain, who undertook the routine and ordinary duty of a hospital chaplain to assist a next of kin by agreeing to notify their chosen funeral home of their choice, actually had the audacity to withhold any form of notification to Plaintiff or his establishment at any phone number or electronic communication, according to the records Plaintiff checked and kept from that time period.  Crist simply did nothing.

122.    For hours that family kept expecting to receive a contact from the funeral director. Finally, after midnight they called, upset, and asked why no one was coming to care for their loved one and referred to the fact Chaplain Crist was supposed to have called much earlier that evening.  Usually those calls from chaplains happen right away and no one else is delegated that duty.  This is outrageous conduct by a chaplain.

123.    An investigation soon ensued and whether connected to this matter or not is unknown for sure to Plaintiff, but Plaintiff can attest to the fact that Chaplain Crist retired from his affiliation with the hospital effective the first of the coming year, 2019.

124.    The family was distressed, and they were not drawn into the investigation.  They did not need to be because the parties worked it out through hospital administration, but this is the kind of subterfuge Plaintiff has been victim of and he alleges the causal link is the Cheer Scandal and the animus of Trustee Crist that permeated from him toward Plaintiff beginning in April 2018.

125.    In early 2019 the referrals through the hospital took a precipitous uptick.

126.    Retaliatory incidents, such as those mentioned above, are not restricted solely to the Plaintiff and other individuals mentioned so far.

127.    Other members of the GCCC and Garden City community were facing their own struggles with the Trustees and Swender.

128.    The faculty senate, a governing body representing the instructors at the College, took note of what was transpiring in April and May 2018, and they saw what happened to Plaintiff Kucharik, Toni Douglass and Eleanor Everett, along with a different cheerleader named Yulissa Hernandez, who in the referenced video attempted to speak to the board about her experiences with Knapp, but was dismissed and ignored.

129.    The faculty senate threw down their own gauntlet at the feet of the Trustees and demanded they take action to hold Swender accountable.  The Cheer Scandal escalated further on May 8, 2018, but not before Plaintiff Kucharik was caused to suffer another materially adverse action, which became well known in the community, and which has caused him harm, which like the Crist incident, above, continues to surface in myriad ways.

130.    What happened next and in the months to follow regarding the College president's eventual ouster and his retaliation against Plaintiff and others is real life, not fiction, and the civil rights of Plaintiff have been damaged by the actions of a tyrannical College president, fueled by maladroit College trustees and aided by callous allies.

131.    On Wednesday, April 11, 2018, Plaintiff was with his boss, Chris Price, who was driving them to their destination when his boss's phone rings and a number appears on the dashboard screen.  The caller was Kim Reule and his boss wonders why she is calling him.  He answered with Plaintiff sitting next to him and she proceeded to take Plaintiff to task for Plaintiff having spoken up at the board meeting the night before.  She pointed out how this would hurt the

business and she wanted to convey that she thought Plaintiff should be let go because he should not have been talking that way about the College and its leadership. The clear message conveyed was get rid of Aaron Kucharik.

132. If Plaintiff had not been in the vehicle and heard the conversation for himself as it happened, perhaps Ms. Reule could spin a different story that this was not her intent, to get him fired, but he was, and she was caught in the act. Plaintiff asserts that Ms. Reule was more probably than not stoked and encouraged by president Swender to play this dirty trick on Plaintiff because she had not been at the meeting the night before, but she was a close ally of Swender at the time as Plaintiff came to find out. She, like Toni Douglass, was a host mom to student athletes at the College and liked to be in the "in" crowd with the College President. The two, Plaintiff and Reule, did not know one another well and it would have been a highly remote possibility that she would feel a need to take this termination idea to Plaintiff's boss, unless she was coached, instructed or primed by Swender. It was an aspect of Swender's personality, as mentioned elsewhere herein, to do just this kind of back door damaging behaviors when anyone dared to criticize him. He was a manipulative and autocratic bully, who flaunted his perceived influential relationships with a very wealthy community member who has donated tens of millions to an Oklahoma higher education institution, but not so much to GCCC as Swender hoped.

133. Reule was at the time closely associated with president Swender. Plaintiff has been told by a member of the community that Reule and Swender were seen together in Reule's driveway the night before this happened.

134. Swender kept a privileged and elite group of individuals in his orbit. The upper crust of Garden City society. Reule was proud to be one of only a dozen or so people invited to be a

benefactor member, for a price, of his select few influencers in his "Presidents Circle" (an invitation-only GCCC patronage group that was billed as providing exclusive access to the College President, but perhaps more importantly he alluded to another benefit membership provided.  Swender peddled an entrée through him into access to his connections, through his son's employment and proximity, to another wealthy individual's highly sought for attention in the community.)

135.    Her phone call was an admonition to a reproach to Plaintiff's boss.  She was negatively-influence peddling because it would likely get her something more in return, if she was successful and she was hoping his boss would also see the benefit to heeding her call.  This was no innocent social slip-up.  It was a threat all the way around and upside down among some of the wealthiest people in the community.  And the spotlight was glaring down on Plaintiff Kucharik linked to Swender, not originating from Reule's civic mindedness and caring attitude toward women athletes.

136.    This is borne out by the non-apology, apology letter Plaintiff Kucharik would receive a week or so later, after her behavior was called out a couple of days later.

137.    The GCCC Endowment Association fundraising event took place April 13, 2018.  It was there that Toni Douglass, who had heard and was deeply offended by what happened to Plaintiff Kucharik and who knew Kim Reule much better than Kucharik in a one-on-one conversation joined by Reule's husband, objected to and called out the behavior for what it was.

138.    Only Reule denied it happened.  That's when Toni Douglass told her that Aaron Kucharik was in his boss's vehicle and heard the whole exchange for himself.

139.    Douglass gave no ground to Kim Reule for the duplicitousness of her conversation with Price in having the temerity and insensitivity toward victims of sexual harassment to call the

boss of another cheer supporter who spoke in favor of women and better Title IX enforcement at the College, Aaron Kucharik, and try to get Kucharik fired for his public support statements at the April 10, 2018 board meeting.

140.    The conversation was brief, to the point, and not overheard by others but it was the precipitating reason, or one of the two reasons referred to and cited by College authorities in the time period, since denied, for the basis to issue on April 25, 2018 to No Trespass Notice. Plaintiff and others assert the No Trespass Notice was Swender's way to hit back at Douglass and try to shut down any more criticism of himself and to send a message to her, to Plaintiff and to others to fear and heed his authority.  It was also a civil rights violation based on the speech of individuals, not threats of violence, to ban Douglass from campus events.  The fall out rolled into Plaintiff's life, who took an ever more solid stand against GCCC's leadership when the Trustees failed to override Swender and rescind the Notice against Douglass.  It stayed in place for months and became well-known in the community about its origins tracing back to Plaintiff Kucharik, the attempt by Reule to get him fired, and the despicable way women's rights were disregarded on the campus of a state institution.

141.    Campus police chief, Rodney Dozier, and a GC police officer came to Douglass' home on April 25, 2018, without prior warning or even the courtesy of a phone call, and he on behalf of the College served on Toni Douglass the unwarranted and baseless No Trespass Notice.

142.    The No Trespass Notice was done for effect, to intimidate and harass her, to surprise her, and to deter further comments by her and others, including Plaintiff Kucharik.  It was an attempt to squelch the speech of anyone associated with the Cheer Scandal, who had spoken up at the April 10 trustees' meeting.

143.   Upon information and belief, Defendant Swender was known to use dubious ways to harm people he thought were critics.  As an example, Douglass will testify that Swender had several years earlier, out of the blue, gleefully whispered in a conspiratorial way to Douglass and her husband how he had used his inside knowledge as College President and phrased it as "caught his hand in the cookie jar" in referring to Leonard Hitz, who came to be elected as a College Trustee thereafter, to cause him problems with unemployment.

144.   In the summer of 2018, another round of "dead drops" occurred with media entities and a few others in town with confidential records from the Department Labor included referring to Leonard Hitz, again.  Oddly, the cryptic, typed note included with the documents used the phrase caught with his hands in the cookie jar.

145.   Plaintiff Kucharik and Douglass have good reason to attribute the source of their back door and front door threats to Defendant Swender.

146.   These were clear signals how far he would go to retaliate against anyone who spoke about GCCC's Cheer Scandal or stood up for women's rights on campus.

147.   Swender, up to five of the Trustees, and/or individuals like Reule acting at the behest of Swender cloaked themselves in state authority, used their positions in or connections to government for the purposes of chilling Plaintiff Kucharik, Toni Douglass and Elizabeth Everett's constitutional rights to free speech, petition, and association.

148.   The College, as an institution, does not have the right to violate Plaintiff's civil rights, quell supporters of Title IX rights using questionable means, including arcane No Trespass Orders or having a GCCC/Swender sanctioned and/or ratified volunteer, working hand in glove with Defendant Swender, contact Plaintiff Kucharik's employer and attempt to get him fired for his April 10, 2018 comments.  The causal links are much more likely than not to the College and

Swender.  In the months to follow, the five Trustees ratified these improper behaviors culminating in a January 2019 vote adopting the findings of investigator's sham report and they have spoken in favor of Swender's behaviors on other occasions, taking issue publicly with Plaintiff and singling him out for retaliation.

149.     At the same January 2019 meeting, Chief Dozier spoke during public comments and among other concerning behaviors and statements referring to the Cheer Scandal and his participation in the No Trespass Notice issuance said: I take it personally.  Sitting at his feet was a backpack he carried to the podium and carefully laid down next to him.  Plaintiff Kucharik knew, upon information and belief, and personal knowledge, that Chief Dozier proudly carries with him everywhere on campus (and in other contexts perhaps rightly so) what he calls his "go-bag".  Only during his public comments he turned around and glared and/or pointed to Plaintiff Kucharik, Toni Douglass and their counsel, as he referred to his personal animus and Plaintiff Kucharik felt threatened.  His voice was shaking and he was visibly upset.  Knowing he more likely than not had his "go bag" prepared and with him, even dressed in civil clothes, a concerning message was felt by Plaintiff.

150.     He along with others went and made a report for the record of this concerning behavior by the Chief of Campus Police, which initially was refused to be taken by the security officer on duty.  When Dozier spoke, he said that his statements or his speaking opportunity had been cleared by the new President Ryan Ruda.

151.     Plaintiff on several occasions in the last year asked for a written follow up on his report including as recently as the March 2020 meeting.  Within the last few weeks, Plaintiff did receive a response from Trustee Wasinger, which was not especially comforting.  The non-responsiveness is asserted as a systemic College leadership failing.  Deliberate indifference to the

rights of an individual under Title IX may be proven with facts such as official decisions not to remedy this issue. This is exactly the point of why Plaintiff is upset by the failure to acknowledge the retaliation for what it is: The College has not and under this theory of the law cannot move on when the official decision is to NOT remedy the issue.

152.    The Plaintiff and others similarly situated have been and still are being sent the message they are dissuaded from making charges of discrimination because nothing has or will change. Retaliation is still a storm cloud over the College because the winds of change have never been swept through the campus to bring systemic assurances that history won't repeat itself.

153.    Plaintiffs seek punitive damages to the extent they are awardable as an earsplitting warning to deter others from engaging in similar aberrant behaviors and risk bringing GCCC or any other Kansas educational institution into analogous, unnecessary disrepute by out of control, state-sanctioned folly and irrationality, carried out by unconstrained, powerful and manipulative College leadership.

## A Final Cautionary Tale of Systemic Community Issues

154.    In May 2018, upon information and belief, Defendant Swender or someone acting at his behest, summoned Garden City police detective, Freddie Strawder for his assistance in retaliating against Elizabeth Everett directly and Plaintiff Kucharik and Toni Douglass indirectly.

155.    Plaintiff Kucharik, Toni Douglass and the Everetts are perceived as existential threats to Swender at the time.

156.    Strawder, a detective and not merely a patrol officer, who at the time was also a criminal justice instructor at GCCC, proceeded to engage in a scheme to invent probable cause to arrest Elizabeth Everett, the cheer student at the center of the Cheer Scandal. Highly summarized but detailed in the police report associated with this May 10, 2018 incident, Strawder begins with an

admission probable cause was lacking in a text comment Everett made to another College cheerleader who openly disliked Everett.  The other young woman said she felt threatened by Everett.

157.    She was directed (apparently by the College) to call him, which is odd.  Strawder invited the peer to come to his office the <u>next</u> day—no urgency to quell supposedly boiling civil unrest between two young women.

158.    Lacking probable cause, it becomes evident from the circumstances described in this police report that Strawder's intent was not to do the "right thing" and defuse a possible confrontation between two women, but rather his intent was to engage in stirring up trouble and engage in unlawful police conduct.  He likely presumed his report would never see the light of day because he recites the steps he took to attempt to create probable cause by having the purported "victim" incite Everett, essentially baiting her, via texts he proposed to exchange between the peer and Everett—while Strawder dictated or directed what to say, how to say it and how to keep pushing the envelope between the two women until he coaxed Everett to allegedly make a criminal threat against the peer.

159.    Conveniently another detective was trailing Everett and when given the signal from Strawder the GCPD pounced and placed Everett under arrest on May 10, 2018 for making a "criminal threat; cause terror, evacuation or disruption".

160.    The Strawder report is beyond cavil; it is outrageous.  It quotes the text exchange, which began only after he clearly indicates any conduct of Everett up to that point was NOT grounds for probable cause to assert a criminal threat had been made.

161.    The peer was likely directed by someone at the College to call Strawder, specifically, because the report does not mention the young woman having contacted Strawder through

dispatch at 911.  The timing of this incident was contemporaneous with an uptick in criticism of Defendant Swender the evening of May 8, 2018, when cheer members (including this young woman) appeared before the board of trustees on May 8 to speak in support of coach Knapp, followed by the 24 hour lag time between the initial phone call to Strawder complaining about Elizabeth Everett making a threat, the whole police involvement appears to be more than just a coincidence.

162.    This first contact was on May 9, but at Strawder's direction another day elapsed before he interviewed the peer.  That is suspicious, if a threat is real to begin with.  Why not call 911?

163.    It was the evening of May 8, 2018 at the board of trustees' meeting where that faculty senate report was delivered to the trustees detailing over 26 pages of complaints about Trustee inadequate oversight over Defendant Swender and exposing publicly a plethora of bullying and intimidating incidents by the President over the past eight or so years at GCCC.

164.    Upon information and belief, this Everett arrest incident was masterminded by Defendant Swender and carried out by loyalists to his cause and his reign.

165.    The police report itself makes clear that Strawder dictated the text baiting, resulting in Everett's arrest, strip search and overnight jail stay.  Plaintiff Kucharik was asked by her mother to bond her out of jail the next day.  He is familiar with the circumstances at the time.  They seem to coincidental to be a coincidence, although the police report was seen by Everett until months later.

166.    And to top it all off--Not so coincidentally, during that overnight stay, unknown individuals with access to the jail paraded Everett's male cheer peer, who tried to extort sex for his silence, through the jail.  Everett was shocked to hear him loudly taunting her from somewhere outside her cell, while she had been totally disrobed and left with only a blanket in

the cell.  She was subjected to punitive treatment by whoever brought this young man to the jail
to taunt her.

167.    These are the people left in responsible charge of several state/municipal authorities in
Garden City and based on their aberrant behaviors detailed herein Plaintiff seeks enforcement of
his civil rights through the federal courts because Defendants and others likely involved, have
and will continue to have no fear of any outside curtailment of their behaviors, because they have
been allowed to run roughshod over the milieu created by state sanctioned authority in the hands
of bad actors wielding unbridled power.  Plaintiff implores this court to find these individuals
and entities responsible for civil rights violations and hold them accountable by awarding
damages commensurate with the offenses in order to remedy past harm and to deter future
misconduct.

168.    Plaintiff along with others dared to question the unrelenting harm and retaliation being
done for years to women students violating their Title IX rights and then he and others were
retaliated against for their support.  All of these facts evidence a discrete and actionable pattern
and practice of the College leadership, Swender and the five Trustees, misusing the authority of
the state whose head bureaucrat, Swender, held sway largely because of his self-promoted
connections to the rich and powerful in Garden City.

169.    Plaintiff's and others' criticisms triggered a series of actionable events conceived by the
College president and carried out, wittingly or unwittingly, by Defendants with the knowledge
and/or intent to damage the Plaintiff and anyone else who spoke or allied with his standpoint.  To
the extent recoverable, these actions warrant punitive damages.

<u>**COUNT I: TITLE IX RETALIATION**</u>
Plaintiff v. Defendant Garden City Community College

170.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

171.    The Supreme Court has long recognized a cause of action for Title IX retaliation against other than the victim of sex discrimination, including for individuals identified as supporting women's civil rights on educational institution's campuses.

172.    The College is a recipient of federal funds.

173.    Plaintiff engaged in a number of protected activities under Title IX including but not limited to the following:

A.  When he registered his repeated objections to the treatment of women athletes because of the abject failures of College administration to have previously put a stop to coach Knapp's repetitive, unwanted sexual advances and comments made to cheer women, noting the failures resulted in Everett becoming susceptible to Knapp's harassing behaviors up through and including March 2018.

B.  When Plaintiff called on Trustees of the College on April 10, 2018 and at various times thereafter, to take action and quit looking the other way and failing to do everything reasonably possible to stop sexually harassing conduct, acknowledge the victims of the past problems, make amends, and publicly resolve to take and enforce permanent measures to prevent future harassment and retaliation for those engaging in protected activity, instead of threatening and intimidating Plaintiff and others who have supported these same efforts.

C.  When Plaintiff called for president Swender's and AD John Green's terminations and for trustees' recalls by way of filing recall petitions in the summer of  2018 with the county clerk, because they had not publicly resolved to take sexual harassment of

cheer women seriously and instead had doubled down on intimidation, threats and harassment, including the college's participation in the May 2018 Strawder unlawful arrest and detention of Plaintiff Everett.

D.  When Plaintiff participated in the college's investigation of the claims made in the Faculty Senate Report by agreeing to be interviewed and provide information about claims he had relevant and first-hand knowledge about, but that protected activity was turned into an opportunity to further retaliate against cheer women and Plaintiff in January 2019 by adopting knowingly inaccurate, misleading and defamatory statements contained therein.

E.  Plaintiff was engaging in protected activities by exercising his free speech rights during the public comment portion of the board meetings, but the College in February 2019 retaliated against Title IX supporters by voting to terminate the public comment section of board meetings to shut down free speech about Title IX issues.

F.  When Plaintiff reported the "dead drop" letters regarding the prior harassment of female cheer participants to the Board of Trustees on April 10, 2018 and he asked why Trustees had not taken action to deal with the complaints.

G.  When Plaintiff asked on numerous other occasions, publicly and privately, why they were not taking action to suspend Swender and others involved in the Cheer Scandal and why they were not lifting the No Trespass Notice against Toni Douglass.

174.  Plaintiff suffered a materially adverse action when he:

A.  was subjected to an act of sabotage of his profession and economic livelihood with the act of trying to get him fired or risk loss of Kim Reule's and perhaps other's business because he spoke up.  She was acting as Swender's surrogate and was acting

as a volunteer of the state, including when her conduct was ratified by the lack of official condemnation by the College following constructive notice to the College that he considered her acts the College's acts.  This retaliatory incident gained notoriety. This act of retaliation, even through the acts of another, equates with a material adverse action.  The threat to his economic standing was real and the likelihood of continuing whisper campaigns, once started, remains.

B.  has been dissuaded from making charges of discrimination by the acts of Defendants Trustees Wasinger, Crist, Douglass, and Worf as recently as the last few months deriding him for demanding accountability, which has not occurred.

C.  has been dissuaded from making charges of discrimination by the acts of Chief Dozier saying it's personal and having said that in the context of having his "go bag" at his feet, pointing his finger at Plaintiff and conveying a threat by a law enforcement officer whose behaviors that evening concern Plaintiff to this day.

D.  was subjected to the Fake KORA request and had his personal emails investigated and reviewed by the person he believes is at the center of the threats of intimidation, Swender.  This violation is a retaliatory and predatory-like behavior by someone who misused his state authority in the guise of another person.

E.  When Trustee Crist retaliated using his chaplaincy to undermine Plaintiff and his employer to attempt to make him look incompetent or uncaring.

F.  Was caused to resign his leadership position with the Endowment Association after learning that Swender was pressuring the executive director to get rid of board members (him) who spoke about the Cheer Scandal and rather than stay on the board

and risk undermining its mission he walked away from an organization he had been proud to serve.  This also reflects on his standing in the community.

G.  Was deprived of his association with friend and colleagues due to the actions of the College and its volunteer, Reule.

175.   There is a causal connection between the protected activity and the materially adverse actions, as evinced by the following facts:

H.  The retaliatory acts came immediately after the protected activities.

I.   The retaliatory acts occurred as part of a clear chain of cause and effect stemming from the protected activity.

J.   The retaliatory acts were in some cases designed to thwart the efficacy of Plaintiff's protected activities and deter him from engaging in protected activities thereafter.

K.  The College trustees' flagrant and open disregard for protecting female students and athletes subjected to gender harassment and retaliation.  The trustees' conduct evinces a direct causal link between the College leaderships' intolerance for Title IX enforcement and actual acts of hostility toward women including significant retaliation as to be extreme and outrageous behavior.

L.  When in February 2019 the four Trustees Wasinger, Crist, Douglass and Worf voted to close public comment sections of their meetings indefinitely as a means to squelch Plaintiff's and others opportunities to address the board in a public setting, which occurred the month after the Dozier incident and release of the investigator's report.

176.   Defendants' conduct was wanton and in reckless disregard for the rights and safety of Plaintiff.

177.    The Defendant College has not engaged in conduct reasonably calculated to end the harassment or retaliation.

178.    Defendant College exhibited deliberate indifference to Plaintiff's rights and wellbeing as alleged above.

179.    Defendant College exhibited conduct that warrants punitive damages.

180.    As a direct result of Defendants' conduct, Plaintiff suffered emotional distress, anxiety and stress, reputational damage, denial of and violation of constitutional rights under the First and Fourteenth Amendments, and additional costs and damages, including attorneys' fees.

181.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under Title IX, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees, punitive damages as justified, and such other and further relief as the Court finds just and proper.

### COUNT II: DEPRIVATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION AND 42 U.S.C. § 1983 FIRST AND FOURTEENTH AMENDMENT VIOLATIONS
Plaintiff v. GCCC, Herbert Swender, Each Named Trustee in official capacities

182.    Plaintiff incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth here.

183.    Plaintiff alleges that at all times relevant hereto, Defendants Garden City Community College, Herbert Swender, Blake Wasinger, Jeff Crist, Merilyn Douglass, Steve Martinez and Teri Worf, were acting under color of state law and their actions were made possible by virtue of state law.

184.    Plaintiff alleges each Defendant in their institutional or official capacities deprived him and caused him to suffer the loss of federal constitutional rights guaranteed to him by the First

and Fourteenth Amendments when each Defendant committed the following acts and violations, including acting in accordance with Defendant GCCC's custom, policy and/or practice in violating Plaintiff's constitutional rights as set forth below:

A. Their acts retaliating against Plaintiff sought to deter and punish him from exercising his First and Fourteenth Amendment rights for having spoken to the board on April 10, 2018 and at many monthly meetings thereafter intending to disturb his associational rights by pressuring individuals including the executive director of the Endowment Association to force him off the board.  Swender interfered with Plaintiffs friendships in an attempt to discourage his speech.

B. The trustee defendants failed to intercede on behalf of Plaintiff when their fiduciary duties obliged them to do so, thereby condoning their employees and/or volunteer's wrongful behaviors because they knew their employee Swender had sent Kim Reule to attempt to get Plaintiff fired and interfere with his contractual relationship with his employer; and they knew he was likely to keep retaliating and they did nothing to deter or punish his behaviors when they had the right to control him from April 11, 2018 until August 13, 2018 to protect Plaintiff from unjustified and unconstitutional infringement of Plaintiff's First and Fourteenth Amendment association, petition and free speech rights in violation of 42 U.S.C. § 1983 for having spoken to the displeasure of Defendants (an unlawful content based retaliation).

C. They denied Plaintiff his First and Fourteenth Amendment petition rights seeking relief from Defendant GCCC when he petitioned them 1. to fix board custom, policies and/or practices associated with retaliation based on the content of one's speech; 2. to fix board custom, policies and/or practices making permanent reforms to assure the

College alleviates gender based discriminatory practices, as written and as applied; and 3. to fix board customs, policies and/or practices to assure no future administration takes any retaliation against individuals who speak in favor of Title IX enforcement.

D. The Trustee Defendants and the College, not Swender, denied Plaintiff's First and Fourteenth Amendment rights to access a public forum when they voted in February 2019 to close for an indeterminate time period any access to the previously open comment period at their board meetings.  Their vote was not a reasonable time, place and manner limitation but an absolute ban at the time it was issued.  It was done for an unlawful purpose to chill speech and petition rights.  Plaintiff has standing to raise the issue because he had previously exercised his rights to the forum for speech purposes.  He had also used the forum as a petition opportunity and that petition opportunity was thereafter foreclosed in retaliation for Plaintiff's and others use of the forum because the Defendants, not including Swender, did not like his speech and did not care to hear his petitions for changes to policy.  Their limitations were unlawful because the action was not the least restrictive means to accomplish whatever purposes they cited to sanction the closure.  The later reopening of the comments does not remediate the lost opportunities at those meetings where comments were foreclosed.  The misuse of otherwise lawful means of restricting speech was and arbitrary abuse of state authority for malicious, wrongful, personal, or ignoble aims and Plaintiff was damaged thereby.

185.    As to each lettered assertion above, these bad acts by the Defendants were done without lawful justification, intentionally, maliciously, and/or with a deliberate indifference to or a reckless disregard for the natural and probable consequences of their acts.

186.    And the Defendants did cause injury and damage to Plaintiff in violation of Plaintiff's constitutional rights as guaranteed under 42 U.S.C. § 1983 and the United States Constitution, including its First and Fourteenth Amendments.

187.    As a result of the foregoing, Plaintiff was deprived of his associational, petition, and free speech rights as well as the right to be free from retaliation for exercising his constitutional rights as specified, he suffered specific and serious prior restraint, and was otherwise damaged and injured.

188.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1983, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

### COUNT III: CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3)
Plaintiff v. GCCC and all named Trustees in their official capacities

189.    Plaintiff incorporates by reference the facts and allegations set forth in all preceding paragraphs as if fully set forth here.

190.    Plaintiff at all times relevant hereto sought to and did exercise his free speech, association and petition rights under the First and Fourteenth Amendments at board of trustees' meetings and elsewhere including in the local media.  The Trustee Defendants each expressed their displeasure

with sufficient clarity and on so many occasions relevant hereto and during the time frame April 2018 through the present that the quantity and quality of evidence will sufficiently corroborate the existence of their personal animus against Plaintiff related to his exercise of his First and Fourteenth Amendment rights at their board meetings.  They did not like his speech and petitioning on the subject of women's rights on the campus.

191.    In this Count Plaintiff asserts violations were committed by the College as an institution through the acts of its elected Trustees and by each named Trustee, Blake Wasinger, Merilyn Douglass, Teri Worf, Steve Martinez and Jeff Crist in their official capacities.

192.    Because Plaintiff spoke up at GCCC for women's rights, at all relevant times hereto, he became well known for and identified as supporting, speaking on behalf of and caring about the respectful treatment of women on the college's campus, its programs and in their community. This is an identified class entitled to the protection of civil rights under the Equal Protection clause.

193.    All Defendants and perhaps unknown others associated with Defendants knew, identified, or thought Plaintiff was a member of a class of one or a class of more than one individuals who are outspoken about GCCC and about the college's leadership, employees, agents or allies treatment of women on its campus, in its programs or associated with its events.  This is an identified class entitled to the protection of civil rights under the Equal Protection clause.

194.    Plaintiff is identified by all Defendants and perhaps unknown others associated with Defendants, as a class of one or more persons who publicly support and advocate for better enforcement of Title IX rights at GCCC, for better treatment of women and their rights at GCCC, and speak critically at times of the College, its administrators, staff, faculty and/or specifically

Defendant Swender and/or the five named trustee Defendants on this subject.  This is an identified class entitled to the protection of civil rights under the Equal Protection clause.

195.    All Defendants and perhaps unknown others associated with Defendants, and the College speaking through its agents, have overtly expressed their animus against Plaintiff at public meetings, in private conversations, through written instruments, texts, emails, and through visible and obvious body language Defendants exhibit at times when they interact with Plaintiff.  The evidence Plaintiff will elicit will show this assertion is true, or more likely true than not, by whatever applicable evidentiary standard may apply for each relevant Defendant although not all examples are capable of being detailed here because they are too numerous.

196.    At least two people comprised an organized conspiracy to violate Plaintiff's civil rights, specifically including each Defendant named herein.  Each had the motivation, then they expressed the motivation, required by the applicable statute, 42 U.S.C. § 1985(3), and exhibited the animus against Plaintiff to form a conspiracy involving two or more people and the alleged conspiracy was carried out by agreement between each named Trustee Defendant or perhaps including others.

197.    And the aim of the conspiracy agreement, motivated by the requisite ill will, was an intent to deprive Plaintiff of his civil rights.

198.    The actionable offense, the aim of the conspiracy, against Plaintiff which if done unlawfully runs the risk of violating his civil rights was to restrict his rights to freedom of speech and petition by closing the Trustees' meetings public forum held on state facilities at the GCCC campus in order to deter him from speaking against or petitioning Defendants about Title IX or other women's rights issues on the GCCC campus.

199.    The mechanism that was misused, as applied, was the resolution at the February 2019

meeting to close the public comment section of their meetings and the fact the College is a state

sponsored and supported entity makes this curtailment the misuse of state authority by state

actors.

200.    Plaintiff asserts the aim of the conspiracy was accomplished when the closure was

effective in February 2019.  He alleges the conspiracy caused him injuries and the deprivation of

his civil rights to freedom to petition government and deprivation of his free speech rights in that

public forum at Trustee's meetings on campus.  The deprivation was a chilling prior restraint on

his speech.  It was intended to harm him by unlawfully controlling his speech to public officials.

201.    Furthermore, the closure had no expiration date, it had no provision for challenging it,

thus lacking in due process, which is a separate violation of his civil rights under the Due Process

Clause of the Fourteenth Amendment.

202.    Plaintiff alleges these five trustees exhibited and expressed animosity toward him before

the closure was voted in, as evidenced by the April 10, 2018 video referenced herein.

203.    Trustee Douglass has exhibited behaviors indicating she bears ill will toward Plaintiff.

She has been heard to sigh loudly, whisper under her breath, make statements critical of Plaintiff,

dismiss comments of Plaintiff with huffs and the like.

204.    Trustees Crist, Worf, Martinez and Wasinger have publicly decried Plaintiff's criticisms

of the college's inadequate Title IX enforcement responses and Plaintiff has been the recipient of

behaviors similar to those of Trustee Douglass detailed above from each of them at different

times.  Therefore, upon information and belief, Plaintiff asserts these trustees are or may have

been part of or contributed to the conspiracy averred in this Count.  Additional discovery is

needed to augment this element; however, the evidence known to Plaintiff to date leads to his

assertion that it is more likely true than not that each one harbors a personal animus against him on the basis of his class identification.

205.    Plaintiff was deprived of the right to equal protection of the law as specified, suffered specific and serious injury, emotional distress, and was otherwise damaged and injured.

206.    WHEREFORE, Plaintiff prays for an award of actual damages against Defendants in an amount in excess of $75,000, under the Constitution and 42 U.S.C. § 1985, fully compensating Plaintiff for the damages suffered as a direct and proximate result of Defendants' unjustified actions, an award of interest and costs of suit, including reasonable attorney fees pursuant to 42 U.S.C. § 1988, punitive damages as justified, and such other and further relief as the Court finds just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all issues so triable.

## DESIGNATION OF PLACE OF TRIAL

Plaintiff designates the place of trial in Kansas City, Kansas.

Respectfully submitted,

/s/ Jean Lamfers
Jean Lamfers, KS #12707
Lamfers & Associates, L.C.
7003 Martindale
Shawnee, KS 66218
Tel.: (913) 962-8200
jl@lamferslaw.com
ATTORNEY FOR PLAINTIFF